IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA,   :
                            :
v.                          :      CRIMINAL INDICTMENT NO.:
                            :      2:15-CR-00002-RWS-JCF
ELMER SWAIN STEWART         :

## ORDER and REPORT AND RECOMMENDATION

This case is before the Court on Defendant's Motion To Suppress Evidence Seized Pursuant To Warrant (Doc. 17). For the reasons discussed below, it is **RECOMMENDED** that Defendant's motion be **DENIED**.

## Procedural History

An Indictment filed on January 20, 2015 charges Defendant with a wire fraud scheme to defraud investors in violation of 18 U.S.C. § 1343. (Doc. 1). On April 7, 2015, Defendant filed a motion to suppress evidence seized by law enforcement officers pursuant to a search warrant issued by this Court on February 12, 2015 (*see* Docs. 36-1, 36-2).[1] (Doc. 17). On August 25, 2015, the Court conducted a hearing on Defendant's motion (*see* Doc. 29), and a transcript[2] of that hearing was filed on September 27, 2015 (Doc. 31). The Government filed a post-hearing brief on October 18, 2015 (Doc. 34), Defendant submitted a post-hearing

---

[1] Defendant also filed a motion to suppress statements (Doc. 12), but that motion has been deferred to the district judge (*see* Doc. 14).

[2] References to that transcript will be designated as "Tr. __."

1

brief on December 3, 2015 (Doc. 36), and the Government filed a reply brief on January 3, 2016 (Doc. 41).  With briefing now complete, the undersigned considers the merits of Defendant's motion.

### Facts[3]

James Harter, a Special Agent with the Federal Bureau of Investigation (FBI) is the primary investigator and case agent in an investigation that began in May 2012 and led to the pending charge against Defendant.   (Tr. 4, 14). Specifically, he investigated Defendant for what Agent Harter believed to be fictitious investments, i.e., "he was providing fictitious investment opportunities to individuals who were then investing money with him for these fictitious investments[.]"   (Tr. 5).   As part of that investigation, Harter was looking for business records that would confirm or deny whether these opportunities existed. (Tr. 5).   On October 30, 2014, Harter learned through a witness, Sam Stephens, that Defendant had stored boxes of "office contents" in the upstairs section of a detached garage belonging to Sam Stephens' nephew Jodie Stephens ("Stephens") at Stephens' residence on Shoal Creek Road in Clermont, Georgia.  (Tr. 5-6, 19-20, 34).   Jodie Stephens was married to Defendant's daughter Tosha at the time. (Tr. 6, 17, 35).  They were later divorced on January 15, 2015.  (Tr. 19, 33).

---

[3] These facts are taken from the hearing testimony of James Patrick Harter, a Special Agent with the Federal Bureau of Investigation, and Jodie Stephens, Defendant's former son-in-law, and from Special Agent Harter's affidavit in support of the search warrant at issue in this motion (Doc. 36-1).

Agent Harter then called Stephens the evening of October 30, 2014 and asked him whether he had the boxes, and he told Harter that he had them and "was anxious to get rid of them." (Tr. 7, 36). Stephens described them as approximately 15 banker-type boxes or office boxes. (Tr. 7). Harter asked him where the boxes had come from, and Stephens told him that "one day he went upstairs in his garage, and the boxes just showed up, and then he questioned his wife at the time, Mr. Stewart's daughter Tosha, and Tosha told him that those were [her] father's office contents . . . from their home on Skitts Mount Road that was foreclosed on." (Tr. 8). Defendant had been evicted from the Skitts Mountain home where his office was located in 2013, so his daughter let him store the contents of his office in Stephens' garage in Clermont, Georgia. (Tr. 9, 26, 35). Neither Defendant or his wife talked to Stephens about storing boxes in the garage. (Tr. 35, 37). Stephens and his wife were still living together as a married couple when the boxes arrived. (Tr. 37). According to Stephens, the boxes had been in his garage for one and a half to two years at the time he and Agent Harter talked. (Tr. 37-38). Stephens saw Defendant bringing another truckload, and he told his wife and Defendant not to store any more of his stuff there. (Tr. 37). All the boxes that are the subject of the warrant were already there when Stephens talked to Agent Harter. (Tr. 37). Stephens and his wife divorced in January, and she and her family were supposed to come get their belongings out of the house by January 15th pursuant to the

3

divorce decree.  (Tr. 40-41).  Stephens did not have any contact with Defendant about getting the boxes; he does not know if his wife did.  (Tr. 41).

Stephens told Harter that "some of the boxes were labeled as tax records, and that on occasions Mr. Stewart would come by the residence, and Mr. Stewart wasn't able to get in the garage because apparently there some kind of code that only allows either Tosha or Jodie Stephens to get in the garage, so Mr. Stewart would have to arrange a time to come by there."  (Tr. 9-10).  Stephens was aware that Defendant "would come by and retrieve items from the boxes to include checks and maps."  (Tr. 10).  According to Harter, Stephens told him that before he asked his wife whose boxes they were, he had looked through the boxes to see who they belonged to and saw "maps and banking records and things like that" that appeared to belong to Defendant.  (Tr. 10, 14-15, 28-29).  Stephens had had no prior contact with the FBI before his October 30, 2014 conversation with Harter, and Agent Harter never asked him to look through the boxes.  (Tr. 10-11).  Harter asked Stephens to keep the boxes secure, but he did never asked Stephens to look through them.  (Tr. 11-12, 29-30). Stephens called Harter several times to request that the FBI to retrieve the boxes because Stephens did not want them taking up space in his garage.  (Tr. 12, 24).  Stephens indicated that he wanted to get rid of them, and Harter told him not to throw them away.  (Tr. 11, 20-21, 23).  Harter also told Stephens "if he could keep Mr. Stewart away from his garage, that would

be great." (Tr. 27). When asked whether Stephens kept Defendant away from the boxes, Harter responded, "I don't think so. I think Mr. Stewart kept him himself away." (Tr. 27).

Contrary to Harter's testimony, Stephens testified that he did not look through the boxes at any time, and he did not tell Harter that he had. (Tr. 36). Stephens further testified that before he discussed the boxes with Harter on October 30, 2014, Defendant would come over to the house to look through the boxes and he would tell Stephens what he was looking for, such as checks, topography maps, or papers. (Tr. 38). Stephens knew the boxes contained business records before he talked to Harter "because some of the boxes even had 'tax records' on the side." (Tr. 38). So he "knew from reading the outside of the boxes that there were business records in the boxes," and he knew from his conversations with Defendant "that they were maps and checks and other kinds of office records from the business that he did[.]" (Tr. 38-39). Stephens told Harter to come get the boxes if he wanted them. (Tr. 39). Stephens also confirmed that Harter never told him to look through the boxes. (Tr. 40).

On February 12, 2015, Agent Harter obtained a search warrant authorizing agents to seize and search "[a]ny and all banker's boxes containing business records of Elmer Swain Stewart located in the garage of the residence of Jody [sic] Stephens located at 6360 Shoal Creek Road, Clermont, Georgia 30527." (*See* Doc.

36-2 at 1).  In Harter's affidavit in support of his application for the search warrant,
Harter described the wire fraud scheme he was investigating, which involved
Defendant's alleged victims, the Owens, giving him money, including in some
instances cashier's checks, for investments in timber tracts, property in a
subdivision, and a golf course, but instead of making those investments or
purchases, Defendant co-mingled the Owens' funds with his own personal monies
and used the proceeds for his personal use, as indicated in Defendant's banking
records.  (Doc. 36-1 at ¶¶ 5-16).  According to Harter, "[t]he Owens advised that
Stewart would often display property tract maps for timber tract investments he
was asking them to invest in, but never gave them copies."  (*Id.* at ¶ 18).  Relevant
to the current motion, Harter wrote:

> On February 2, 2015[4], Jodie Stephens, Stewart's former son-in-law,
> advised your affiant that he possessed approximately 10 to 15 office
> document boxes that contain Stewart's business and banking records.
> Stephens advised that while he was still married to Stewart's
> daughter, Stewart was evicted from his residence.  During that same
> time the boxes were brought to his garage and left, although Stephens
> was not present when the boxes were delivered.  Stephens advised that
> he has looked through the boxes and observed in them checks, bank
> documents and statements, real estate property type maps, and other
> business records that Stephens identified as belonging to Stewart.  The
> boxes are still stored in the garage of Stephen's residence located at
> 6360 Shoal Creek Road, Clermont, Georgia 30527.

---

[4] Agent Harter explained at the hearing that Mr. Stephens originally told him about
the boxes on October 30, 2014, but then he had a conversation with Mr. Stephens
on February 2, 2015 to confirm the information and make sure the boxes were still
there.  (Tr. 21-22, 29-31).

(*Id.* at ¶ 19).  Thus, Harter requested a search warrant authorizing the seizure of those boxes and "authorization to search the boxes for records related to any bids Stewart made for timber rights, any records related to an investment in the subdivision described above, and any investment in the golf course described above.  In addition, the FBI seeks authority to document the contents of the boxes to establish the absence of any such records."  (*Id.* at ¶ 20).

## Discussion

Defendant argues that the seizure and subsequent search of his boxes violated the Fourth Amendment because: (1) they were seized without a warrant when Agent Harter instructed Jodie Stephens to preserve the boxes and keep Defendant away from them; (2) probable cause does not support the issuance of the warrant "because the affidavit does not establish probable cause to believe that the boxes contained evidence of a crime"; and (3) probable cause does not support the issuance of the warrant because Agent Harter misrepresented in the affidavit that Jodie Stephens looked in Defendant's boxes.  (*See* Doc. 36 at 7-8).  The Government contends that Defendant's motion should be denied because Defendant lacked a legitimate expectation of privacy in the boxes, the boxes were not seized without a warrant, probable cause supported the issuance of the search warrant irrespective of Agent Harter's alleged misrepresentation about Mr. Stephens looking in the boxes, and even if probable cause is lacking, the *Leon*

good faith exception to the exclusionary rule applies.  (*See generally* Doc. 41).
The undersigned considers these arguments in turn.

## I.    Whether Defendant Had A Legitimate Expectation Of Privacy In Boxes

The Government argues that Defendant has not met his "burden of proving
he was aggrieved by the alleged seizure, that is, that he had a legitimate
expectation of privacy, commonly referred to as standing, in the seizure." (Doc. 41
at 6).  "The 'capacity to claim the protection of the Fourth Amendment depends on
whether the person who claims the protection of the Amendment has a legitimate
expectation of privacy in the invaded place.' " *United States v. Merricks*, 572 Fed.
Appx. 753, 756 (11th Cir. 2014) (unpublished decision) (quoting *Minnesota v.
Carter*, 525 U.S. 83, 88 (1998)).  "Accordingly, a defendant has standing to
challenge a search and seizure only if the defendant 'had a legitimate expectation
of privacy in the property when it was searched.' " *Id.* (quoting *United States v.
Gibson*, 708 F.3d 1256, 1276 (11th Cir. 2013)).  "The defendant bears the burden
of establishing a legitimate expectation of privacy in the area searched." *Id.* at 757.
"Making this determination involves a two-part inquiry: (1) 'whether the
individual has manifested "a subjective expectation of privacy in the object of the
challenged search[,]" . . . [and (2)] whether society is willing to recognize the
individual's expectation of privacy as legitimate.' " *United States v. Vega-
Cervantes*, No. 1:14-CR-00234-WSD-JFK, 2015 U.S. Dist. LEXIS 106602, at

*18-19 (N.D. Ga. Apr. 17, 2015) (quoting *United States v. Hastamorir*, 881 F.2d 1551, 1559 (11th Cir. 1989)), *adopted by* 2015 U.S. Dist. LEXIS 106705 (N.D. Ga. Aug. 13, 2015).

"Courts assess on a case-by case basis the 'standing' of a particular person to challenge an intrusion by government officials into an area over which that person lacked primary control," as was the situation here.  *United States v. Bendelladj*, No. 1:11-CR-557-AT-AJB, 2014 U.S. Dist. LEXIS 184100, at *14 (N.D. Ga. Dec. 29, 2014), *adopted by* 2015 U.S. Dist. LEXIS 75370 (N.D. Ga. June 10, 2015). "No one circumstance is talismanic to this inquiry." *Id.*  And " '[w]hile property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of . . . [the] inquiry.' " *Id.*  (quoting *United States v. Salvucci*, 448 U.S. 83, 92 (1980)).  "Other factors to be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises." *Id.* at *14-15 (citing *United States v. Pitt*, 717 F.2d 1334, 1337 (11th Cir. 1983) and *United States v. Haydel*, 649 F.2d 1152, 1154-55 (5th Cir. 1981)).  "To have an expectation of privacy in premises that he

did not own or lease, a defendant must show 'an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee.' " *Id.* at \*15 (quoting *United States v. Bushay*, 859 F. Supp. 2d 1335, 1350 (N.D. Ga. 2012)) (internal quotation omitted)).

The Government contends that the following factors indicate that Defendant does not have standing to contest the seizure of his boxes: "that he moved the boxes to Stephens' garage without Stephens['] knowledge or permission, that defendant did not have access to the area where the boxes were stored, that defendant had to seek Stephens' assistance to gain access to the garage, and that defendant left the boxes in Stephens' garage for at least 18 months," and "there is no evidence that during the 18 month period defendant made any attempt to move the boxes to a location he controlled." (Doc. 41 at 8). The record shows that the boxes at issue belonged to Defendant and that they held records belonging to him, but "property rights are neither the beginning nor the end of . . . [the] inquiry." *Salvucci*, 448 U.S. at 92. Defendant has not shown that he had the right to exclude others from the garage where he stored the boxes; to the contrary the evidence shows that he had to arrange with Stephens or Stephens' wife to access them because there was an access code on the garage. (*See* Tr. 9-10). Thus he has not shown "an unrestricted right of occupancy or custody and control of the premises."

10

*Bushay*, 859 F. Supp. 2d at 1350. Moreover, there is no evidence that he "took normal precautions to maintain his privacy," *Bendelladj*, 2014 U.S. Dist. LEXIS 184100, at *15, by securing the boxes or their contents, e.g., by sealing them or locking them in an area to which only he had access and could exclude others. Moreover, although he appears to have initially received at least implied permission from his daughter to store the boxes in the garage, he left the boxes in Stephens' garage from sometime in 2013 until they were seized in February 2015, even after his daughter and Stephens were divorced and his daughter had moved from the residence. Under these circumstances, it is doubtful that Defendant has met his burden of showing that he had a legitimate expectation of privacy in the boxes stored in Mr. Stephens' garage. Nevertheless, the undersigned will assume for the sake of discussion that Defendant has met that burden and consider his other arguments.

## II.   <u>Whether The Boxes Were Seized For Fourth Amendment Purposes</u>

Defendant contends that Agent Harter seized Defendant's boxes without a warrant by instructing Jodie Stephens to retain Defendant's boxes and to not let Defendant have access to the boxes. (*See* Doc. 36 at 7, 9-12; *see also* Tr. 11, 20-21, 23, 27). "A defendant asserting rights under the Fourth Amendment has the initial burden of demonstrating that a warrantless search or seizure occurred." *United States v. Williams*, No. 1:14-CR-321-WSD-GGB, 2015 U.S. Dist. LEXIS

94643, at *7 (N.D. Ga. Mar. 13, 2015) (citing *United States v. Bachner*, 706 F.2d 1121, 1125-26 (11th Cir. 1983)). " 'A "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property.' " *United States v. Odoni*, 782 F.3d 1226, 1237 (11th Cir. 2015) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).  The undersigned finds that Defendant has not met his burden of demonstrating that Agent Harter meaningfully interfered with his possessory interests in the boxes.  Defendant has not shown that he tried to access his boxes or was prevented from accessing them by virtue of Harter's instructions to Stephens.  Defendant points out that "there was an access code required for Mr. Stewart to gain access to the boxes and thus Mr. Stephens did have the ability to keep Mr. Stewart away from the boxes."  (Doc. 36 at 12). Harter testified that Stephens told him that "on occasions Mr. Stewart would come by the residence, and Mr. Stewart wasn't able to get in the garage because apparently there some kind of code that only allows either Tosha or Jodie Stephens to get in the garage, so Mr. Stewart would have to arrange a time to come by there."  (Tr. 9-10).  That testimony indicates that the access code existed prior to Stephens' discussions with Harter about the boxes.  Critically, Defendant has not presented evidence that Harter instructed Stephens to place the access code on the garage or shown that Stephens used the access code to prevent Defendant from accessing the boxes pursuant to Harter's instructions.

Defendant also asserts that but for Harter's directive to Stephens to keep the boxes, "Mr. Stephens would have thrown the boxes away or perhaps Mr. Stewart might have taken the boxes away himself." (Doc. 36 at 12). But Defendant has not shown that he attempted to exercise his property rights by seeking to take the boxes away himself or instructing Mr. Stephens to dispose of them, but was thwarted in his efforts. Stephens testified that he had no contact with Defendant about coming to get the boxes (Tr. 41), and Defendant did not provide evidence that he sought to retrieve them, even after Stephens had divorced Defendant's daughter and she no longer lived in the house. Even if Agent Harter's instructions interfered with *Jodie Stephens'* right to use his property as he chose, i.e., to rid his property of Defendant's boxes, the issue in this motion is whether law enforcement meaningfully interfered with *Defendant's* rights, not those of Mr. Stephens. *See United States v. Perry*, 379 Fed. Appx. 888, 895 (11th Cir. 2010) (unpublished decision) ("A defendant cannot seek to suppress evidence unless he shows 'that *his* Fourth Amendment rights were violated by the challenged search or seizure.' " (quoting *United States v. Padilla*, 508 U.S. 77, 81 (1993) (emphasis in original)). Accordingly, the undersigned finds that law enforcement did not seize Defendant's boxes without a warrant and therefore, to the extent that Defendant moves to suppress evidence seized from Jodie Stephens' garage on the ground that it was seized without a warrant, it is **RECOMMENDED** that that motion be **DENIED**.

13

## III.    Whether Probable Cause Supported The Issuance Of The Search Warrant

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by law enforcement officers or agents and further provides that "no Warrants shall issue, but upon probable cause . . . ."  U.S. Const. amend. IV. "Where a search is conducted under the authority of a warrant, the defendant challenging the search carries the burden of showing the warrant to be invalid." *United States v. Kilgore*, 2012 U.S. Dist. LEXIS 154148, at *14 (N.D. Ga. Sept. 13, 2012) (internal quotation omitted), *adopted by* 2012 U.S. Dist. LEXIS 153867 (N.D. Ga. Oct. 26, 2012).  "It is not easy for a Defendant to meet this burden, and a judicial preference is accorded searches under a warrant." *United States v. Teague*, No. 2:10-CR-006-RWS-SSC, 2010 U.S. Dist. LEXIS 142717, at *86 (N.D. Ga. Nov. 22, 2010) (internal quotation omitted), *adopted by* 2011 U.S. Dist. LEXIS 42260 (N.D. Ga. Nov. 22, 2010).

"The Fourth Amendment allows warrants to issue on probable cause, a standard well short of absolute certainty."  *L.A. County v. Rettele*, 550 U.S. 609, 615 (2007).  The task of a magistrate judge, when issuing a warrant, " 'is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place.' "  *United States v. Miller*, 24 F.3d 1357,

14

1361 (11th Cir. 1994) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  The

*Miller* court explained the role of a court reviewing a search warrant:

> Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrate[ judges] in their probable cause determinations.

*Miller*, 24 F.3d at 1361 (citing *Gates*, 462 U.S. at 236-37).

The undersigned has considered Agent Harter's affidavit (Doc. 36-1) with

these principles, and Defendant's arguments about its deficiencies, in mind.  It is

not necessary, however, to determine whether the affidavit established the

existence of probable cause because the good faith exception to the exclusionary

rule set out in *United States v. Leon*, 468 U.S. 897 (1984) applies in this case.  *See,*

*e.g., United States v. Jones*, 149 F. Appx 954, 963 (11th Cir. 2005) (unpublished

decision) ("We need not determine whether probable cause existed, because the

good faith exception applies here."); *United States v. Dos Santos*, No. 1:05-CR-

613-TWT, 2006 U.S. Dist. LEXIS 55943, at *15 (N.D. Ga. June 21, 2006) ("The

good faith exception is applicable to this case; therefore, this court need not reach

the underlying issue of probable cause."), *adopted by* 2006 U.S. Dist. LEXIS

55944 (N.D. Ga. July 25, 2006).

The exclusionary rule, which provides that evidence seized as the result of a search violative of the Fourth Amendment may not be used by the Government in a subsequent criminal prosecution, is " 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect.' " *Martin*, 297 F.3d at 1312 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).   In *Herring v. United States*, 555 U.S. 135 (2009), the Supreme Court addressed the limited role of the exclusionary rule:

> The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies.   *Illinois v. Gates*, 462 U.S. 213, 223[] (1983).   Indeed, exclusion "has always been our last resort, not our first impulse," *Hudson v. Michigan*, 547 U.S. 586, 591[] (2006), and our precedents establish important principles that constrain application of the exclusionary rule.

*Id.* at 140.   The Court explained that "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."   *Id.* at 144.   The purpose of the exclusionary rule is "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."   *Id.*

In the earlier case of *United States v. Leon*, the Supreme Court had modified the exclusionary rule to allow prosecutors to use evidence "obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral

magistrate but ultimately found to be unsupported by probable cause." 468 U.S. at

900. In *Martin*, the Eleventh Circuit Court of Appeals explained what has become

known as the *Leon* good faith exception to the exclusionary rule:

> [*Leon*] stands for the principle that courts generally should not render
> inadmissible evidence obtained by police officers acting in reasonable
> reliance upon a search warrant that is ultimately found to be
> unsupported by probable cause. The *Leon* good faith exception
> applies in all but four limited sets of circumstances. *Id.* at 923. The
> four sets of circumstances are as follows: (1) where "the magistrate or
> judge in issuing a warrant was misled by information in an affidavit
> that the affiant knew was false or would have known was false except
> for his reckless disregard of the truth"; (2) "where the issuing
> magistrate wholly abandoned his judicial role in the manner
> condemned in" *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319[] (1979);
> (3) where the affidavit supporting the warrant is "so lacking in indicia
> of probable cause as to render official belief in its existence entirely
> unreasonable"; and (4) where, depending upon the circumstances of
> the particular case, a warrant is "so facially deficient – i.e., in failing
> to particularize the place to be searched or the things to be seized –
> that the executing officers cannot reasonably presume it to be valid."
> *Id.* (internal quotation marks omitted).

*Martin*, 297 F.3d at 1313 (original formatting altered).

The second and fourth circumstances are clearly not present here—there is

no evidence that the issuing judge (the undersigned) abandoned his judicial role in

issuing the warrant, and the warrant sufficiently describes the place to be searched

and the things to be seized, i.e., "[a]ny and all banker's boxes containing business

records of Elmer Swain Stewart and the contents thereof" located "in the garage of

the residence of Jody Stephens located at 6360 Shoal Creek Road, Clermont,

Georgia 30527." (*See* Doc. 36-2 at 1). Rather, Defendant's arguments implicate the first and third circumstances described in *Leon*—that Agent Harter misled the issuing judge by making a false statement in his affidavit, and that his affidavit was so lacking in indicia of probable cause to believe that evidence of a crime would be found in Defendant's boxes that official belief in its existence was unreasonable. (*See* Doc. 36 at 7-9, 12-15). The undersigned finds these contentions to be without merit.

First, Defendant contends that Harter included a false statement in his affidavit by stating that "Stephens advised that he has looked through the boxes and observed in them checks, bank documents and statements, real estate property type maps, and other business records that Stephens identified as belonging to Stewart." (Doc. 36 at 8-9; Doc. 36-1 at ¶ 19). Defendant asserts "[t]his statement is not true. Jodie Stephens told Agent Harter no such thing" (Doc. 36 at 8), based on Mr. Stephens' hearing testimony that he never looked in the boxes and did not tell Agent Harter that he did (Tr. 36), contrary to Harter's hearing testimony (Tr. 14-15, 28-29). "In *Franks v. Delaware*, 438 U.S. 154 [ ] (1978), the Supreme Court addressed the first exception to the application of the good faith doctrine of Leon – whether a defendant has the right to challenge the truthfulness of factual statements made in an affidavit in support of a search warrant." *United States v. Skow*, No. 1:11-CR-373-CAP-ECS, 2012 U.S. Dist. LEXIS 142668, at *9-10 (N.D.

18

Ga. Sept. 13, 2012), *adopted by* 2012 U.S. Dist. LEXIS 142091 (N.D. Ga. Oct. 1, 2012).   "[W]here the defendant makes a substantial preliminary showing that an affiant knowingly and intentionally included a false statement in an affidavit, or made the false statement with reckless disregard to its truth, *and the false statement is necessary to a finding of probable cause*, then the Fourth Amendment requires that a hearing be held at the defendant's request."  *Id.* at *10 (emphasis in original). "Negligent or innocent mistakes, however, do not violate the Fourth Amendment." *Id.*

Based on the evidence presented at the hearing, the undersigned finds that Defendant has not shown that Agent Harter knowingly and intentionally included a false statement in his affidavit, or made the false statement with reckless disregard to its truth.  Even if the Court credits Mr. Stephens' testimony that he never looked inside Defendant's boxes, Stephens did testify that before he spoke with Harter, he was aware of the contents of the boxes, i.e., that they held business or office records, checks, and property maps, by virtue of the fact that they said "tax records" on the outside of them and based on his conversations with Defendant. (Tr. 38-39).  Even if Harter was mistaken, misunderstood, or made an assumption about the basis for Stephens' knowledge of the boxes' contents, it is uncontroverted that Stephens was aware that the boxes contained "checks, bank documents and statements, real estate property type maps, and other business

19

records" belonging to Defendant, as Harter stated in his affidavit.  (Doc. 36-1 at ¶ 19).  Nor has Defendant shown that Stephens did not convey that information to Agent Harter as Harter stated in his affidavit and testified to at the hearing.  Thus, the undersigned finds that even if Agent Harter erroneously stated that Stephens looked inside the boxes, Defendant has not demonstrated that Harter knowingly and intentionally included a false statement in his affidavit, or made the false statement with reckless disregard to its truth.  *See, e.g.*, *United States v. Railey*, No. 11-15185, 2012 U.S. App. LEXIS 14269, at * 5-6 (11th Cir. July 12, 2012) (finding that affiant "negligently included" an erroneous assumption in the search warrant affidavit, but that defendant failed to show that the inclusion was done "with knowledge or in reckless disregard for the truth").

"In addition, the defendant must show that, if the misrepresentations were removed from, or the omitted facts were included in, the warrant affidavit, then probable cause would be lacking."  *United States v. Rousseau*, No. 14-14506, 2015 U.S. App. LEXIS 18039, at *2 (11th Cir. Oct. 19, 2015) (unpublished decision). Here, if Harter's affidavit had stated that Stephens had learned about the contents of the boxes from his conversations with Defendant rather than from opening them as Stephens testified, the affidavit would still show that the boxes contained Defendant's business records, checks, and maps as Stephens told Harter, and the probable cause would not be lacking.  Accordingly, Defendant has not shown that

the issuing judge was misled by information in the affidavit that Harter knew was false or would have known was false except for his reckless disregard of the truth. Therefore, the first circumstance set forth in *Leon* is not present.

With respect to the third circumstance set forth in *Leon*, i.e., whether the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, Defendant contends that "even if there were not any misrepresentations . . ., the Court still must suppress the evidence because the affidavit does not establish probable cause to believe that the boxes contained evidence of a crime."  (Doc. 36 at 7).  First, Defendant asserts that "[t]he contents of the boxes was unknown and not mentioned by any other part of the investigation."  (*Id.* at 13).  To the contrary, the evidence at the hearing established that Stephens told Agent Harter that the boxes contained Defendant's business records, checks, and property maps.  The affidavit stated that the Owens had given Defendant checks for the alleged investments, that the Owens reported that Defendant had shown them property tract maps but had not given them a copy, and that the agents' had reviewed Defendant's banking records (*see* Doc. 36-1), which are documents similar to those that contained in Defendant's boxes stored in Mr. Stephens' garage, i.e., "checks, bank documents and statements, real estate property type maps, and other business records" (Doc. 36-1 at ¶ 19).

Defendant also contends that "there was absolutely no indication that [the boxes] contained evidence relating to timber bids." (Doc. 36 at 13). The undersigned disagrees. In light of the nature of the documents stored in Defendant's boxes, the undersigned finds the affidavit was not so lacking in indicia of probable cause to believe that the boxes contained evidence of Defendant's receipt of proceeds related to the investments under investigation, his use of such proceeds for purposes other than for those investments, and/or evidence showing whether or not Defendant took any steps with respect to those investments.

Finally, Defendant asserts that there was no temporal link established between the contents of the boxes and the crime under investigation, pointing out that "[t]here is no information in the search warrant affidavit to indicate when the contents of the box[es] were placed therein," and "the last payment allegedly received by Mr. Stewart in the indictment was in January 2010." (Doc. 36 at 14-15). The affidavit shows that the alleged scheme to defraud the Owens involved multiple alleged investments and lasted for several years, from as early as 2006 when Defendant "offered to give the Owens an opportunity to invest with him in acquiring the timber rights to a certain property," through 2011 when Defendant allegedly engaged in activity designed to "lull" the Owens about their investments. (*See* Doc. 36-1 at ¶¶ 6-15). Given the volume of records stored in Mr. Stephens' garage, i.e., 10 to 15 banker's boxes, the contents of those records, including

"checks, bank documents and statements, real estate property type maps, and other business records," the undersigned finds that the it was reasonable to believe that records related to the alleged wire fraud scheme from 2006 through 2011 would be found in boxes of Defendant's business records that he moved to Mr. Stephens' garage in 2013.[5]

The undersigned finds that it was not entirely unreasonable for Agent Harter "to believe that what he wrote in the affidavit would be sufficient to support a finding of probable cause," nor was it unreasonable for the agents executing the warrant to believe that it was supported by probable cause. *Martin*, 297 F.3d at 1315. Rather, "[t]he affidavit contained sufficient indicia of probable cause to enable a reasonable officer to execute the warrant thinking it valid." *Id.* Accordingly, the *Leon* good faith exception to the exclusionary rule applies. *See, e.g., United States v. McClure*, 160 Fed. Appx. 842, 844-45 (11th Cir. 2005)

---

[5] Harter testified that the boxes were moved to the garage in 2013 when Defendant was evicted from his home (Tr. 9), and Stephens testified that they had been stored there for one and a half to two years at the time he and Agent Harter talked in October 2014 (Tr. 37-38). Although Agent Harter did not state in his affidavit that the boxes were moved to the garage in 2013, the Court can consider information known to Agent Harter but not included in the affidavit in determining whether his reliance on the search warrant was reasonable. *See, e.g., United States v. Bridges*, 347 Fed. Appx. 459, 463 (11th Cir. 2009) (finding that the investigator's "affidavit and the additional facts known to him that were omitted from the affidavit contained enough indicia of probable cause to determine that his reliance on the warrant was reasonable"); *see also Kilgore*, 2012 U.S. Dist. LEXIS 154148, at *27 (finding that the officers "had an objectively reasonable basis to believe that the warrant was valid" based on the information contained in the affidavit as well as information not included in the affidavit).

(unpublished decision) (finding that *Leon* good faith exception applied even where "the affidavit for the search warrant [did] not explicitly state any grounds for believing [the informant's] information was reliable, or the circumstances through which [the informant] made his disclosure to police" because "it was not entirely unreasonable for [Officer] Creel to believe his affidavit supported a finding of probable cause, as it tied the defendant to the residence and the criminal activity with specific dates, and, therefore, sufficient information was contained within [the affidavit] to conclude that a fair probability existed that seizable evidence would be found in the place to be searched"); *United States v. Henry*, No. 1:09-CR-0522-1-TCB-GGB, 2010 U.S. Dist. LEXIS 139164, at *16-18 (N.D. Ga. Dec. 7, 2010) (finding that, even if probable cause was lacking due to the alleged staleness of information in the affidavit, "the affidavit was not so lacking in indicia of probable cause as to render official belief in its existence unreasonable," and therefore, the *Leon* good faith exception applied), *adopted by* 2011 U.S. Dist. LEXIS 1641 (N.D. Ga. Jan. 6, 2011).

Moreover, there is no evidence that Agent Harter's conduct in seeking the warrant or the agents' conduct in executing the warrant was "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. Nor is there evidence that the agents engaged in "deliberate, reckless, or grossly

negligent conduct," such that exclusion of the evidence seized is warranted. *Id.* Therefore, to the extent that Defendant moves to suppress evidence seized from Jodie Stephens' garage pursuant to a search warrant on the ground that probable cause did not support the issuance of the warrant, it is **RECOMMENDED** that Defendant's motion be **DENIED**.

## Summary

For the foregoing reasons, it is **RECOMMENDED** that Defendant's motion to suppress evidence (Doc. 17) be **DENIED**.

**IT IS ORDERED** that, subject to a ruling by the District Judge on any objections to orders or recommendations of the undersigned Magistrate Judge, this case is **certified ready for trial.**

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this 5th day of February, 2016.

  /s/ *J. CLAY FULLER*
J. CLAY FULLER
United States Magistrate Judge